IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
No. 94-60771

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LEMMUEL AMON BOND,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

June 27, 1996

Before GARWOOD, HIGGINBOTHAM, and BENAVIDES, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

This case concerns a defendant's attempt to withdraw a guilty plea he entered before fleeing the country. The district court refused to allow the defendant to withdraw the plea. We affirm.

I

In 1990, federal law enforcement officials began investigations into a drug ring centered in part around a man named Sergio Duque. Using a confidential informant, the DEA arrested several members of the ring who had delivered over 300 kilograms of cocaine to a truck stop in Texas. At about that time the DEA

seized a Suburban, a cellular phone, and several miscellaneous weapons. The defendant, Lemuel Bond, turned himself in a few days after the arrests. Almost immediately, the DEA initiated administrative proceedings to forfeit the Suburban and cellular phone; later proceedings included the weapons as well.

A grand jury indicted Bond for conspiracy to possess and actual possession of more than five kilograms of cocaine. Bond initially pled not guilty. On December 19, 1990, Bond met with several DEA and IRS agents. The meeting centered on Bond's offer to serve as a government undercover informant in return for leniency. Bond's counsel was not present at the meeting. Nine days later, the DEA declared the suburban forfeited. The forfeiture papers recited that the DEA had received no claims upon the vehicle, listed the owner as one "Joseph B. Robles," and declared the property forfeited pursuant to 21 U.S.C. § 881.

On January 10, 1991, Bond was rearraigned and pled guilty to the conspiracy count of the indictment. The plea agreement consisted of a written document and several terms memorialized only by oral statements from the Assistant United States Attorney to the district court. The written agreement required Bond to plead guilty to conspiracy and the government to dismiss the possession count, stipulate that Bond had accepted responsibility, and recommend a sentence at the bottom of the guidelines range. At the plea colloquy, the AUSA also asked the court to release Bond on a surety bond to allow him to participate in an undercover operation. The AUSA stated that "if [Bond] is able to provide substantial

2

assistance to the government[,] we will file a motion 5K1 under the guidelines for a downward departure at the time of sentencing." The district court gave a standard set of admonishments to Bond; on the subject of the expected sentence, the court stated only as follows: "[T]he maximum theoretical imprisonment is ten years up to life and up to a $4 million fine and at least five years of supervised release." The court did specifically mention the statutory minimum sentence.

Bond was released on bond and began cooperating with the government. He completed a meeting with Duque in New York City and verified a few pieces of information regarding the Duque organization. On January 18, the DEA declared that the cellular telephone seized in the arrest was forfeited; this forfeiture declaration listed Bond as the phone's owner and the basis of the forfeiture as 21 U.S.C. § 881.

The probation office had completed a Pre-Sentence Report by February 23, 1991. Objections were then due by March 5, and sentencing set for April 11. Before the sentencing date, Bond fled the United States. Some two years after his flight, Bond made an audio tape and sent it to officials in the United States; the tape included various allegations of misconduct by law enforcement officials, and suggested that Bond fled because he feared that he would be murdered by members of a Colombian drug organization. Bond remained abroad until he was arrested in June of 1993 in Honduras and brought back to the United States. While Bond was abroad, the DEA issued notice that the miscellaneous weapons seized

3

at the drug arrests had been forfeited as abandoned.  The notice listed Bond as the weapons' owner.

One month later, Bond filed the first of four eventual motions to withdraw his guilty plea.  In toto, the motions made the following allegations and arguments in support of the request to withdraw the plea:

1.   The government breached its obligations under the plea agreement by failing to enroll Bond and his family in the federal witness protection program, and by failing to otherwise protect Bond and his family from imminent threats from Colombian drug organizations.   Bond's flight resulted from this fear.   The government also anticipatorily breached its obligations under the plea bargain by announcing its intention not to file a motion under U.S.S.G. § 5K1.1 for a downward departure.
2.  Government law enforcement agents coerced Bond into lying to other agents and to the district court with threats of violence to his person and of prosecution of his family made at the December 19, 1990 meeting, which was conducted in violation of Bond's right to counsel.
3.   The court should exercise its discretion to allow Bond to withdraw the plea because it was made promptly upon his recapture, and because Bond was factually innocent of the charges.
4.  The district court failed to comply with Fed. R. Crim. P. 11 because it did not inform Bond of the statutory minimum sentence attending the conspiracy charge.

A magistrate judge held a hearing upon the motion to withdraw the plea.  At the hearing, the magistrate initially admitted into evidence, over the government's objection that it was hearsay, a transcript of the tape Bond made while abroad.  The magistrate also heard testimony of several law enforcement officers familiar with Bond's case.  The officers uniformly testified that while the government had promised to protect Bond, it had never promised to put him in the federal witness protection program, and that Bond had at no time expressed a fear that he was in imminent danger of harm from any source.  Each officer agreed that Bond had cooperated

4

up until his flight, but that he had generated no information of value at that time. All testified that they had not threatened Bond in any way. Because of the passage of time, no officer was able to remember a specific phone conversation during which he or she had obtained the permission of Bond's attorney to conduct the December 19 meeting in counsel's absence, but each would have obtained such permission before conducting the meeting, and each thought that counsel had consented. Bond called his previous attorney, who testified that he could not remember specifically giving permission for the December 19 meeting to occur, but that he had at one point before Bond's guilty plea given agents permission to interview Bond without counsel. The attorney also stated that he would have wanted to be present at an interview like that held on December 19. Also in his case in chief, Bond introduced notes of the December 19 meeting and another government document suggesting that the officers had discussed the federal witness protection program with Bond and that Bond had initially demanded that he and his family be placed in it.

After calling all other witnesses, Bond's counsel attempted to elicit a ruling from the magistrate judge that if Bond took the stand to testify as to the terms of his plea bargain, he would not be subject to government questioning regarding his plea of actual innocence. In response, the magistrate stated that if Bond took the stand, he would be forced to answer questions regarding any and all grounds in his motion to withdraw, and that he could avoid questioning about his role in the underlying drug transaction only

if he abandoned his claim of actual innocence. Bond did not testify.

The magistrate issued a report recommending that Bond's motion be denied. In its report, the magistrate reversed the earlier ruling admitting the transcript of the tape Bond made while a fugitive, explaining that the decision to admit had been based upon the mistaken assumption that Bond would take the stand and that the government on cross-examination would attempt to show that Bond's stated reasons for flight were recent fabrications. In the absence of the transcript of the tape, the magistrate found no evidence in the record supporting Bond's allegations of a breach of the plea agreement or misconduct by government agents. The magistrate found that failing to inform Bond of the minimum prison sentence was harmless error in that Bond would have pled guilty after a complete Rule 11 colloquy. The magistrate found that federal agents had in fact obtained the permission of Bond's attorney to conduct the December 19 meeting with Bond in counsel's absence. Finally, the magistrate refused to exercise its discretion to allow Bond to withdraw his plea, relying on the total absence of evidence in the record to support Bond's innocence, the delay of well over two years in filing the motion, and Bond's flight.

Bond filed objections to the magistrate judge's report together with a motion to dismiss the indictment based on double jeopardy principles. The motion alleged that Bond had not received notice of the forfeiture of the Suburban, the cellular phone, or the miscellaneous weapons, and that forfeiture of these items

constituted prior jeopardy. The district court denied the motion. The court also found that Bond had not rendered substantial assistance to the government in that his activities had resulted in no arrests, indictments, convictions, or seizure of property. After adopting the report and recommendations of the magistrate, the district court sentenced Bond to 27 years in prison and five years supervised release.

## II

Bond appeals on numerous grounds. His primary argument is that the Double Jeopardy Clause prevented the government from punishing him after forfeiting the Suburban, the cellular phone, and the miscellaneous weapons. His secondary contention is that the district court should have allowed him to withdraw his plea. Bond makes arguments based upon an alleged government violation of Brady v. Maryland, 373 U.S. 83 (1963), and irregularities in the sentencing process; after examining the record on these latter contentions, we conclude that they lack merit.

### A

We hold that the forfeitures of the Suburban, phone, and miscellaneous weapons did not bar Bond's criminal conviction. The forfeitures of Bond's phone and weapons could not constitute prior jeopardy because both occurred after January 10, 1991, the date Bond pled guilty. See United States v. Wong, 62 F.3d 1212, 1214 (9th Cir. 1995) ("[J]eopardy attaches in [a] criminal action at the time [the] guilty plea is accepted by the court.") (alterations

7

added) (citing <u>United States v. Smith</u>, 912 F.2d 332, 324 (9th Cir. 1990)); <u>see also</u> <u>United States v. Torres</u>, 28 F.3d 1463, 1465 (7th Cir.) ("You can't have double jeopardy without a former jeopardy."), <u>cert. denied</u>, 115 S. Ct. 669 (1994). Bond's double jeopardy theory might support a return of the phone and weapons; it does not support his motion to dismiss the indictment. The forfeiture of the Suburban could not constitute prior jeopardy because Bond filed no claim in that forfeiture proceeding and because the declaration of forfeiture listed Joseph B. Robles, not Bond, as the owner of the Suburban. <u>United States v. Arreola-Ramos</u>, 60 F.3d 188, 192 (5th Cir. 1995). Under the reasoning of <u>Ramos</u>, the Suburban belonged either to Robles or to no one, and thus its forfeiture could not constitute punishment against Bond. Bond's allegation that he received no notice of these proceedings is irrelevant to his double jeopardy argument. <u>Id.</u> at 190-91.

B

We hold that the district court committed no error by refusing to allow Bond to withdraw his guilty plea. The district court's decision depended primarily on two evidentiary rulings: first, that the transcript of the tape Bond made while a fugitive was inadmissible; and second, that if Bond took the stand to testify regarding the terms of his plea agreement, he would be subject to cross-examination regarding all of the grounds asserted in his motion to withdraw. We affirm the first ruling and find the second not preserved for appellate review. Our rulings on these

8

evidentiary matters lead us to affirm the district court's decision.

1

Bond complains of two of the magistrate judge's evidentiary rulings. We find no reversible error.

The magistrate judge initially admitted into evidence a transcript of the tape Bond made while a fugitive, but later reversed himself and held that the transcript constituted inadmissable hearsay. We agree with the magistrate's ultimate result. The transcript was not admissible under Fed. R. Evid. 801(d)(1)(B) because Bond did not testify. It was not admissible as an admission by a party-opponent because it was not "offered against a party" within the meaning of Fed. R. Evid. 801(d)(2); Bond offered the transcript to benefit himself. The transcript was hearsay, fell within no hearsay exception, and the magistrate judge correctly excluded it from evidence.[1]

Bond also attacks the magistrate judge's statements from the bench, in effect a ruling on a motion in limine, that if Bond took the stand to testify regarding the terms of his plea bargain, he would waive his privilege against self-incrimination with regard to all grounds asserted in his motion to withdraw. See Calloway v.

---

[1] Bond finds fault in the magistrate's post-hearing reversal of the decision to admit the transcript, arguing that had he known that the transcript was inadmissible, he could have taken the stand to testify on his own behalf. We find this argument unpersuasive. The evidentiary ruling was, of course, subject to reconsideration at any time before final judgment, and we cannot label reasonable Bond's supposed reliance on the magistrate's initial ruling that this type of rank, self-serving hearsay was admissible.

9

*Wainwright*, 409 F.2d 59 (5th Cir. 1968), <u>cert. denied</u>, 395 U.S. 909 (1969). <u>But see</u> <u>McGahee v. Massey</u>, 667 F.2d 1357 (11th Cir.), <u>cert. denied</u>, 459 U.S. 943 (1982). We hold that Bond has failed to preserve this issue for appellate review.

In <u>Luce v. United States</u>, 469 U.S. 38 (1984), the Supreme Court held that a defendant's refusal to take the stand prevented the court of appeals from reviewing his contention that the district court improperly denied his Fed. R. Evid. 609(a)(1) motion in limine to preclude impeachment by evidence of a prior conviction. The Supreme Court supported its conclusion on several grounds. First, the Court noted that Rule 609(a)(1) requires a careful balancing of the probative value of the prior conviction against the prejudicial effect to the defendant, and in order to conduct this balancing effectively, the district court "must know the precise nature of the defendant's testimony." <u>Id.</u> at 41. Second, the Court labeled speculative any possible harm from the refusal to grant the motion in limine, since the district court could always rule in the defendant's favor after hearing his testimony and because the government might decline to use the conviction to impeach. Third, the Court noted that because "an accused's decision whether to testify 'seldom turns on the resolution of one factor,' a reviewing court cannot assume that the adverse ruling motivated a defendant's decision not to testify." <u>Id.</u> at 42 (<u>quoting</u> <u>New Jersey v. Portash</u>, 440 U.S. 450, 467 (1979) (Blackmun, J. dissenting)). Fourth, the Court noted that an accused's failure to take the stand makes it difficult to conduct

10

a harmless error analysis; the Court found no comfort in the possibility of a detailed offer of proof because the defendant's "trial testimony could, for any number of reasons, differ from the proffer." 469 U.S. at 41 n.5.

In this case, as in Luce, "[t]here was no commitment by petitioner that he would testify if the motion were granted, nor did he make a proffer to the court as to what his testimony would be." 469 U.S. at 39. Moreover, the second, third, and fourth concerns of Luce are equally present here. This case does not involve Rule 609(a), but courts have refused to limit Luce to Rule 609(a) cases and have instead applied its principles to analogous contexts. See, e.g., United States v. Nivica, 887 F.2d 1110, 1115-17 (1st Cir. 1989) (invoking the Luce doctrine in a case involving a district court's denial of a defendant's motion in limine to limit the scope of cross-examination of the defendant to the subjects addressed on direct), cert. denied, 494 U.S. 1005 (1990).[2] While we do not necessarily endorse the holdings of these cases, we do draw from them the principle that Luce is not limited to rulings footed upon Rule 609(a).

It is not possible to separate testimony regarding the terms of Bond's plea agreement from the circumstances leading to that agreement. As the government largely conceded below, the entirety

[2] See also United States v. Sanderson, 966 F.2d 184, 189-90 (6th Cir. 1992) (Fed. R. Evid. 608(b)); United States v. Ortiz, 857 F.2d 900, 905-06 (2d Cir. 1988) (Fed. R. Evid. 404(b)), cert. denied, 489 U.S. 1070 (1989); United States v. Griffin, 818 F.2d 97, 103-04 (1st. Cir.) (Fed. R. Evid. 403), cert. denied, 484 U.S. 844 (1987); United States v. Weichert, 783 F.2d 23, 25 (2d Cir.) (Rule 608(b)), cert. denied, 479 U.S. 831 (1986).

11

of the terms of Bond's bargain were not included in either the written plea agreement or in the rearraignment colloquy. We believe it likely that in order for his testimony to have carried any persuasive force, Bond would have had to delve into the events underlying his arrest and the nature of the assistance he offered federal law enforcement officials. An inquiry into such matters would necessarily have concerned Bond's factual guilt or innocence, a subject Bond strenuously sought to avoid.

We find the difficulties inherent in separating those subjects about which Bond wished to testify from those he did not analogous to the first concern of the Luce court. Without hearing the testimony, the magistrate had little chance of knowing whether Bond's testimony could be limited in accordance with his motion. The magistrate could not perform the careful, fact-specific analysis required to separate subjects and categorize evidence as going to one issue or another.

We recognize that the Luce court distinguished Portash in part on the ground that, like this case, Portash involved a constitutional claim. Luce also distinguished Portash as a state case involving the question of whether a state appellate court's ruling on the merits had properly preserved the federal issue for Supreme Court review under state procedural law. In addition, we note that at least four justices of the Portash court stated or hinted that the issue either had not been properly preserved, even in the state court context, or might not have been properly preserved had the case arisen in federal court. 440 U.S. at 462-63

12

(Powell, J., joined by Rehnquist, J., concurring); 440 U.S. at 463-71 (Blackmun, J., joined by Burger, C.J., dissenting).

### 2

Given our disposition of Bond's evidentiary challenges, we have little difficulty in affirming the district court's holding that Bond did not carry his burden of showing that the government breached the plea agreement. There was simply no evidence before the court that the government promised to enroll Bond in the federal witness protection program. There was no evidence that Bond ever communicated a specific fear of harm to himself or his family, or that he ever requested protection. The evidence showed only that the government agreed to provide protection should the need arise but that the need never arose. No evidence supported Bond's charges of misconduct by government agents. No evidence supported the conclusion that Bond met the condition precedent to the government's duty to move for a 5K1.1 downward departure, namely, that he provide substantial assistance to the government's war on drugs. We find unassailable the district court's conclusion that the government did not breach the plea agreement.

### 3

We hold that the district court did not abuse its discretion in refusing to allow Bond to withdraw his guilty plea. This court applies a totality of the circumstances test with a special eye to seven factors to decide whether a district court has abused its discretion under Fed. R. Crim. P. 32(d): whether the defendant has asserted his innocence, whether the government would suffer

13

prejudice if the motion were granted, whether the defendant delayed in filing the motion, whether the withdrawal would inconvenience the court, whether the close assistance of counsel was available, whether the original plea was knowing and voluntary, and whether the withdrawal would waste judicial resources. United States v. Carr, 740 F.2d 329, 343-44 (5th Cir. 1984), cert. denied, 471 U.S. 1004 (1985). Bond has asserted his actual innocence, but under Carr, this factor is insufficient on its own in the total absence of evidence to support the assertion, since a contrary rule would grant the defendant an unappropriate ability to reverse his decision to plead guilty. 740 F.2d at 344. In this case, the magistrate found no evidence supporting Bond's innocence; Bond's argument that the absence of evidence is due to the magistrate's ruling regarding waiver of his Fifth Amendment rights is puzzling, given that Bond's stated reason for not taking the stand was to avoid questions regarding his innocence of the crime. Bond's two year delay in waiting to file his motion to withdraw is extraordinarily long; in Carr, this court found a delay of several weeks unduly lengthy. 740 F.2d at 345.

The district court found that Bond's plea was knowing and voluntary, and that Bond had the close assistance of competent counsel. Bond attacks these findings on the ground that the meeting at which the plea was negotiated was conducted in the absence of his counsel, and that the district court's factual finding that his counsel consented to this meeting was clearly erroneous. We cannot agree. Because of the passage of time, no

14

witness could remember a specific conversation in which counsel granted or denied the government's request to interview Bond. The government agents testified that they would not have conducted the interview without obtaining counsel's leave. Bond's counsel testified that he would not have allowed such a lengthy interview to be conducted in his absence, but that he did give government agents permission to conduct an uncounseled interview on one occasion. In short, the evidence supporting both sides was conflicting and indirect, and the credibility call belonged to the district court.

Although the magistrate made no findings as to prejudice, waste of resources, or inconvenience, we note that every testifying witness showed some difficulty remembering the relevant events. The evidence showed that the 30 month passage of time, during which witnesses' memories faded and the judicial process stopped, was entirely Bond's fault. Those wishing to persuade the district court to exercise its discretion in their favor should not skip bond. We find no error.

4

Any error regarding the district court's alleged failure to inform Bond of the statutory minimum for the offense he had committed is harmless. In deciding whether a Fed. R. Crim P. 11 violation is harmless error, this court focuses on "whether the defendant's knowledge and comprehension of the full and correct information would have been likely to affect his willingness to plead guilty. Stated another way, we 'examine the facts and

15

circumstances of the ... case to see if the district court's flawed compliance with ... Rule 11 ... may reasonably be viewed as having been a material factor affecting [defendant]'s decision to plead guilty.'" <u>United States v. Johnson</u>, 1 F.3d 296, 302 (5th Cir. 1993) (en banc) (quoting <u>United States v. Bachynsky</u>, 934 F.2d 1349, 1360 (5th Cir.) (en banc), <u>cert. denied</u>, 502 U.S. 951 (1991)) (alteration in original). In this case, the district court specifically found that Bond did not even allege that full compliance with Rule 11 would have affected his decision to plead guilty, and we find no such allegation in Bond's brief to this court. Given Bond's rather extensive criminal history, his only hope of avoiding a long jail term was cooperation with the government or an illegal flight. The evidence that he had committed the underlying offense was strong. The plea agreement recited that Bond could face ten years to life "and/or" a fine, and thus the harm Bond alleges would stem from the failure to delete the word "or" from the agreement. The alleged Rule 11 violation was not a deciding factor in Bond's decision to plead guilty.

AFFIRMED.